**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**



| | |
|---|---|
| TREVOR SCOTT, a minor, by his parents and next friends,<br>William and Carol Scott<br>12507 Carrington Hill Drive<br>Gaithersburg, Maryland 20878<br><br>and<br><br>WILLIAM AND CAROL SCOTT<br>12507 Carrington Hill Drive<br>Gaithersburg, Maryland 20878<br><br>      Plaintiffs,<br><br>      v.<br><br>JERRY D. WEAST (officially as),  Superintendent,<br>Montgomery County Public Schools,<br>850 Hungerford Drive,<br>Rockville, Maryland 20850,<br><br>and<br><br>MONTGOMERY COUNTY BOARD OF<br>EDUCATION,<br>850 Hungerford Drive,<br>Rockville, Maryland 20850,<br><br>      Defendants. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Preliminary Statement**

1.     Trevor Scott ("Trevor") is an eight-year-old boy who resides in Montgomery

County with his parents, Carol and William Scott ("the parents" or "the Scotts").  The Scotts

bring this action because Montgomery County Public Schools ("MCPS") failed to provide Trevor

with the Free Appropriate Public Education ("FAPE") to which he is entitled by the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 *et seq.* In addition, the Administrative Law Judge ("ALJ") in this action erred in concluding that the Scotts were not entitled to receive tuition reimbursement for the 2007-08 and 2008-09 school years.

### Jurisdiction

2.      This Court has jurisdiction pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794;  42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.  This court has pendent jurisdiction pursuant to MD. CODE ANN. EDUC. § 8-401 *et seq.*, (1996).  Plaintiffs have exhausted their administrative remedies and appeal from a decision of an Administrative Law Judge ("ALJ") of the Maryland Office of Administrative Hearings, MSDE-MONT-OT-09-41152 (March 10, 2009).

### Parties

3.      Trevor Scott is a disabled student, eligible to receive special education and related services, who at all times relevant to this action resided in Montgomery County, Maryland.  His parents, Carol and William bring this action on Trevor's behalf and in their own right.

4.      Jerry D. Weast is the Superintendent of the Montgomery County Public Schools ("MCPS" or "the school system") and, as such, is the public official charged with the responsibility for ensuring that MCPS complies with federal law as to the education of disabled children.  He is sued in his official capacity.

5.      The Montgomery County Board of Education is a local educational agency as defined by 20 U.S.C. § 1401, and, as such, receives financial assistance from the United States Department of Education.  The Montgomery County Board of Education is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County.

### Factual Allegations

6.      Trevor was born on April 9, 2001.

7.      Trevor has been diagnosed with the following: Attention Deficit Hyperactivity Disorder (ADHD), a speech-language impairment secondary to a Mixed-Receptive-Expressive Language disorder and processing defect, and a Developmental Coordination Disorder with Dyspraxia and Dysgraphia.  In addition, he has limited visual attention, distractibility, poor postural stability, immature behaviors, limited strength, poor motor planning skills and bilateral coordination.

8.      In 2007, Trevor was diagnosed with Electrical Status Epilepticus Sleep Syndrome ("ESES"), a disorder causing continual seizure-type activity in his brain, primarily during sleep.

9.      At age one, in May 2002, Trevor was referred to Montgomery County's Infants and Toddlers Program due to concerns with his motor development.  Subsequent assessments using the Mullen Scales of Early Learning showed global delays in all areas, with the most significant delay in the area of gross motor skills.  Trevor began receiving special education services from the County, through the Infants and Toddlers Program.

10.      In September, 2004, Trevor began attending public school at the Preschool Education Program ("PEP") at Stone Mill Elementary School ("Stone Mill"), in a three-year-old

classroom.  At that time, the County coded Trevor with a developmental delay.  In March, 2005,

a PEP Student Summary Report recommended that Trevor continue in a structured classroom

environment with a small student-to-teacher ratio.  The report further indicated that Trevor was

benefitting from his Speech/Language, Occupational, and Physical Therapy services.

      11.    For the 2005-06 school year, Trevor transitioned to a PEP class for four-year-old

children, where he continued to receive full-time special education services outside the general

education setting.

      12.    On March 27, 2006, an Individualized Education Program ("IEP") team convened

to discuss Trevor's transition to kindergarten.  The team developed goals and objectives and

recommended placement in the special education kindergarten class at the School-Based

Learning Center at Rachel Carson Elementary School ("Rachel Carson").  The IEP called for

Trevor to receive eighty-three percent of his instruction and services outside the general

education setting, as well as Speech/Language Therapy for one hour per week, Occupational

Therapy for one hour per week, and Physical Therapy for forty-five minutes per week.  The team

continued to find Trevor eligible for special education as a child with a developmental delay.

      13.    The Scotts had several concerns with the proposed IEP.  They did not feel that

Trevor had made sufficient progress during his two years at Stone Mill, or during his two years in

the Infants and Toddlers Program, and also were concerned that Trevor was not ready for

kindergarten.

      14.    Due to their continued concerns with Trevor's lack of progress in the PEP

program, in April, 2006, the Scotts enrolled Trevor in a speech/occupational therapy group at the

Treatment and Learning Center ("TLC"). The parents informed Trevor's PEP teacher that he was beginning the TLC program at that time.

15.     Because Trevor showed immediate and significant progress in the TLC therapy group, the Scotts investigated education settings using a model similar to the one used at TLC. They learned that TLC offers a preschool program through the Katherine Thomas School ("KTS") that is based on the same model. In June, 2006, they made the decision to enroll Trevor in the KTS preschool in the fall due to the inadequacy of the proposed MCPS kindergarten program at Rachel Carson. They informed MCPS of their decision.

16.     Because MCPS had not conducted any formal testing of Trevor before proposing his program and placement, the Scotts requested an Independent Educational Evaluation ("IEE") in June, 2006. An IEP meeting was held on July 11, 2006, and the parents authorized MCPS to conduct psychological and educational evaluations, as well as Speech/Language and Occupational Therapy assessments. Although they had already informed MCPS personnel of Trevor's attendance in the TLC Therapy Group, the parents shared this information with the entire team and informed them that because of his significant progress in the program, they intended to place him in the KTS preschool program that fall, instead of enrolling him at the MCPS proposed placement.

17.     Over the next months, MCPS completed assessments and observations of Trevor at the TLC Therapy Group. On August 31, 2006, the IEP team met to discuss the completed evaluations and assessments and review his progress. The parents felt, and the team agreed, that Trevor had shown large improvements due to his participation in the TLC program. The meeting was continued to September 19, 2006.

18.     The IEP team met again on September 19, 2006, to discuss Trevor's eligibility and his IEP for the 2006-07 school year. The team agreed that Trevor continued to be eligible for special education as a student with a developmental delay. However, despite the evidence and agreement that Trevor was making significant progress at TLC, the team continued to propose placement at Rachel Carson. The team proposed that Trevor spend eighty percent of his time outside of the general education setting and that he receive twenty-seven-and-a-half hours of specialized instruction, as well as Speech/Language, Occupational and Physical Therapy. Finally, the team proposed that Trevor would be included in general education classes for gym, specials, lunch, and recess.

19.     The parents renewed their concerns and stated their belief that Trevor required a full-time, self-contained special education setting. The Scotts did not believe that Rachel Carson could meet Trevor's unique educational needs, and thus requested that MCPS place and fund him at KTS, where he continued to make progress. The parents requested that the team refer the case to the Central IEP ("CIEP") level for consideration of this placement. MCPS refused to refer the case.

20.     Shortly after the September IEP meeting, the Scotts retained ABC's for Life Success and Michelle Davis, an educational consulting group. Ms. Scott and Ms. Davis observed the proposed program at Rachel Carson, where both noted several concerns. Most concerning was the general inappropriateness of the program for Trevor, due to the level of noise, multiple distractions, chaos, and teaching techniques which would be inappropriate. They were also concerned with the placement of the program's lunchroom table – next to an unlocked, unmonitored door leading to the playground. No barriers existed between the playground and an

-6-

adjacent four-lane roadway. They were very concerned that Trevor, who sometimes runs away when startled, might be overwhelmed by the noisy, chaotic lunchroom, and run off the school grounds and into the fast-moving traffic.

21.     In December, 2006, Trevor participated in a National Institute of Mental Health ("NIMH") autism research project. While Trevor did not meet the criteria for a diagnosis of an autism spectrum disorder, the report identified him as having significant developmental delays in all areas of cognitive and adaptive functioning. Further, it was noted that he had difficulty sustaining attention. The report recommended a full-time, special education setting with highly intensive and individualized instruction, minimal distractions, and integration of Speech/Language and Occupational Therapy.

22.     As part of the NIH study, in February, 2007, Trevor underwent a sleep study, which included an EEG and video monitoring. The EEG was abnormal due to slow background and bilateral multifocal eplilepticform spike discharges. This abnormal medical test led to the diagnosis of Electrical Status Epilepticus in Sleep ("ESES"). This is an extremely rare brain-based disorder for which there is no established treatment protocol. Sometimes ESES can be resolved with medication and/or is simply outgrown at adolescence. Therefore, it is important for programming and placement to be consistent with a possibility for sudden, significant improvement.

23.     On March 13, 2007, counsel for the parents provided MCPS with a copy of Trevor's NIMH report, along with a report on the sleep study/EEG, which provided the initial diagnosis of ESES, and report on the brain MRI performed on the student. The parents had concerns regarding the privacy of the medical records once released to MCPS and requested a

-7-

meeting with their legal counsel to discuss their concerns before releasing the documents. Counsel requested that the reports not be disclosed until explicit consent was given by the parents. On March 15, 2007, MCPS agreed not to disclose the reports until consent had been received. On March 19, 2007, the parents, after being reassured by counsel that the reports were private, authorized the documents to be released to MCPS for its review.

24.    In March and April of 2007, Trevor underwent neurological consultations at Children's National Medical Center and Johns Hopkins. Both reports indicated that Trevor had a considerable developmental delay and recommended treatment for ESES.

25.    On April 30, 2007, MCPS staff once again observed Trevor at TLC.

26.    On May 2, 2007, William Tyson, an MCPS school psychologist, conducted a brief and cursory review of the NIMH report and concluded, without mention of Trevor's diagnosis of ESES, that he appeared to meet the criteria for a special education disability code of Mental Retardation.

27.    On May 7, 2007, the parents attended an IEP meeting. Based on Mr. Tyson's report, MCPS personnel were advocating for Trevor to be labeled as mentally retarded. The parents strongly disagreed with this conclusion and were shocked at the school system's complete disregard of Trevor's new medical diagnosis. They requested that Mr. Tyson expand his report to include MCPS testing and the medical information they had provided to MCPS. It was agreed that the meeting would reconvene on June 11, 2007, and the parents requested a copy of Mr. Tyson's revised report prior to the meeting.

28.    On June 11, 2007, having never received a copy of the revised report, the parents returned for the continuation of the IEP meeting. Upon arrival for the meeting, MCPS provided

the parent and her advocate a copy of the revised report.  After reviewing the report, they realized

that it did not contain the information that Mr. Tyson agreed to include.

29.    Because MCPS had suggested and advocated for a code of mental retardation, and

because the school system clearly did not understand Trevor's new medical diagnosis, the parents

and their representatives felt it was necessary for Trevor to be evaluated privately.  Counsel for

the parents shared this information with counsel for MCPS and the parties agreed to postpone the

meeting until the completion of all independent evaluations.

30.    In the summer of 2007, Trevor's parents arranged for him to be evaluated by Dr.

Vincent P. Culotta, to begin on July 9, 2007.  The parents also sought Dr. Culotta's input

regarding medical intervention to treat Trevor's ESES.  The parents were inclined to begin

treatment with the medications having the least potential for side effects and Dr. Culotta

concurred with their position.

31.    The Scotts recognized that Trevor's medical condition was a priority and in

August, 2007, he began his first medication in response to the ESES diagnosis.  The Scotts and

Dr. Culotta were concerned that the medication might impact Trevor's performance on the

standardized testing.  Testing was therefore postponed during the period of time when Trevor's

dose of medication was being introduced and then increased.  The testing resumed in October

2007, once the dose was stabilized.

32.    MCPS insisted on scheduling an IEP meeting for Trevor for August 14, 2007.

The parents, through counsel, notified MCPS that they did not consent to the meeting going

forward if Trevor's eligibility code was going to be discussed because they felt strongly that Dr.

Culotta's report was necessary before a coding decision could be made. They again requested that the meeting be postponed to allow them to get a preliminary report from Dr. Culotta.

33.     The meeting on August 14, 2007 went forward without the parents present. However, prior to the meeting, counsel for the parties agreed that while the team would meet and develop an IEP for Trevor to comply with any applicable timelines, the issue of coding would be deferred until all private evaluations were completed. At the meeting, MCPS developed an IEP and once again proposed that Trevor be placed at Rachel Carson with twenty-five hours of academic services to be provided in a special education classroom. The team continued to propose that Trevor would be in the general education setting for his specials, lunch and recess.

34.     On August 21, 2007, the parents provided notice that they were rejecting the MCPS proposed program and placement because Rachel Carson was not an appropriate placement for their son, and that they intended to seek public funding for his private placement.

35.     On August 15, 2007, Serena Wieder, a clinical psychologist who worked with Trevor, provided a summary of her consultation. Dr. Wieder felt that it would be inappropriate to consider Trevor mentally retarded, and concluded that traditional testing would not be the best way to assess Trevor's potential given his under-reactivity, hypotonia, and abnormal electrical activity in his brain. Dr. Wieder recommended a school setting for Trevor with a low teacher-to-student ratio, an environment with minimal distractions and an integrated sensory-motor program through the day. Dr. Wieder further recommended that his academic program should start with high salience topics and be experientially based.

36.     In September, 2007, Trevor's parents enrolled him in the Diener School, a small private school in Maryland designed to meet the needs of young students with special education

-10-

needs. Diener provides a holistic approach to education that promotes academics, cognitive function, and constructive social, language and sensory experiences. Students learn experientially in small class settings with individualized attention.

37.     In the Winter of 2007, Dr. Culotta completed Trevor's Neuropsychological Evaluation. Dr. Culotta diagnosed Trevor as a, "youngster with Multiple Disabilities secondary to Attention-Deficit/Hyperactivity Disorder, Speech-Language Impairment secondary to Mixed Receptive-Expressive Language Disorder and Processing Deficits and Developmental Coordination Disorder." Notably, Dr. Culotta disagreed with Mr. Tyson's recommended coding and diagnosis of mental retardation.

38.     On February 15, 2008, the parents provided MCPS with Dr. Culotta's Neuropsychological Evaluation. On March 3, 2008, MCPS requested permission to observe Trevor in his placement at Diener, and further invited the parents to an IEP meeting scheduled for March 17, 2008. The parents consented to the observation, but requested that the IEP meeting be re-scheduled to allow MCPS time to complete its observation of Trevor before the meeting.

39.     On March 31, 2008,  Mr. Tyson, Nancy Favin, an MCPS special education resource teacher, and Dara Franklin, an MCPS speech-language pathologist, conducted observations of Trevor at Diener. The observation was atypical, as MCPS arrived to the school over forty-five minutes late and after classroom activity was done for the morning. The Learning Skills Specialist at Diener, Kim McWhorter, took Trevor into another room and worked with him specifically so that MCPS could observe him.

40.     Mr. Tyson reviewed Dr. Culotta's report and abandoned his conclusion that Trevor was mentally retarded. Mr. Tyson, however, made no suggestion that he had any further understanding of Trevor's condition or that he had conducted further investigation as to how his diagnoses affect him academically.

41.     On May 5, 2008, MCPS held an IEP meeting. Based on its review of Dr. Culotta's report, as well as the classroom observation, the team found Trevor eligible to receive special education and related services as a student with an Other Health Impairment ("OHI"). The team agreed to reconvene to draft an IEP for Trevor.

42.     On May 30, 2008, the parents provided MCPS with the revised letter from Dr. Marc DiFazio, the initial having been provided at the May 5th IEP meeting. Dr. DiFazio noted that while Trevor does not meet the diagnostic criteria for an autism spectrum disorder, he does have some manifestations of autism. He noted that his learning challenges have been compounded by his ESES, which is known to disrupt learning abilities, behavior, and speech and language. Though there is no set treatment for ESES, Dr. DiFazio recommended a small class size and small teacher/student ratio, a consistent and reliable educational setting, charting for any seizure-like behavior, and minimal distractions and stimuli. In particular, Dr. DiFazio noted that, because of Trevor's frequent epileptic discharges, he may be overwhelmed by loud noises and excessive activity, which will thus disrupt his learning process.

43.     On June 2, 2008, the IEP team reconvened to develop an IEP for Trevor. The team proposed an increase in Trevor's services to thirty hours per week of direct special education services, to be provided in a self-contained special education classroom. The team determined that based on the severity of his needs, Trevor was in need of a more intensive setting

-12-

than Rachel Carson could provide. The IEP team referred his case to the CIEP level for further review and consideration of Trevor's placement. The team indicated that Rachel Carson would be Trevor's interim placement.

44.     On July 7, 2008, MCPS convened the CIEP meeting. The CIEP team reviewed Trevor's evaluations and educational needs and concluded that he required a separate day school to meet his IEP goals and objectives. The team agreed that Diener was an appropriate placement for Trevor, but noted that it could not place Trevor there due to the school's lack of a Maryland State Department of Education certification. The CIEP team instead proposed placement at the Carl Sandburg Center, a public separate special education school. The team refused to grant the parents' requests to increase Trevor's Speech/Language and Occupational Therapy services and provide for a one-to-one aide.

45.     The parents expressed their concern that Carl Sandburg could not provide Trevor with an appropriate education. While the parents agreed to observe Carl Sandburg, they again requested that MCPS place and fund Trevor at Diener.

46.     In a July 11, 2008 letter, MCPS confirmed that staff from Carl Sandburg had reviewed Trevor's file and concluded that his needs could be met at the school without a one-to-one aide.

47.     On July 25, 2008, Trevor's parents, along with their educational consultant observed the proposed program and placement at Carl Sandburg and confirmed that it was not an appropriate placement for Trevor. The parents had several concerns about placing Trevor at Carl Sandburg. First, Trevor was doing very well at Diener and according to Dr. Culotta there could be detrimental outcomes from moving him. The parents therefore had serious reservations about

transitioning him out of that setting. Moreover, the parents were discouraged and concerned with the Principal's reaction after reviewing Trevor's IEP goals. She noted that they were too academic and too ambitious. Finally, the parents were aware that Carl Sandburg was in the middle of an important administrative transition, and were concerned about how it would affect the school program.

48.     On November 7, 2008, the parents filed a Request for Due Process Hearing based on the ongoing failure of MCPS to provide Trevor with a FAPE. As a remedy for the MCPS failure, the Scotts requested reimbursement for the cost of tuition at KTS, and Diener for the 2006-07 and 2007-08 school years. The Scotts also requested placement for Trevor at Diener for the 2008-09 school year.

49.     The due process hearing was held on February 9-13, 2009. At the hearing, the parents limited their request to reimbursement for the 2007-08 and 2008-09 school years at Diener. The parents waived their right to reimbursement for the 2006-07 school year.

50.     The parents presented witness testimony from Dr. Scott, Trevor's mother, Ms, Davis, the education consultant, Dr. Culotta, and Jillian Copeland, the director of the Diener School. The school system presented witness testimony from Susan Carmi, Trevor's preschool teacher from the PEP program, Pamela Nazzaro, Principal of Thurgood Marshall Elementary School, Bill Tyson, School Psychologist for MCPS, Bonnie Dickman, Learning Center Coordinator at Rachel Carson Elementary School, Jennifer Hay, Instructional Specialist in the Placement and Assessment Service Unit for MCPS, Terri Bell, Occupational Therapist, and Seth Goldberg, School Psychologist for at Carl Sandburg.

51.     MCPS witnesses, including Mr. Tyson, testified that they had failed to review the wealth of medical information presented to them from the parents on Trevor and his very unique condition. They further testified that they took no appropriate actions to learn more or understand the impact that ESES has on Trevor academically. The testimony therefore revealed that MCPS staff tasked with programming and planning for Trevor had no idea of the educational implications of his diagnosis.

52.     Because MCPS failed to fulfill its obligation to completely evaluate Trevor and fully understand the education implications of his diagnosis, Trevor's mother, Dr. Scott, testified that the family had no choice but to go out and collect their own evaluations and medical information to provide to the team about Trevor. Even with this information, however, Dr. Scott testified that the team did not acknowledge the level of service Trevor required until the summer of 2008. In the meantime, the family was left with no option but to fund private placements for Trevor.

53.     Ms. Davis and Ms. Copeland testified about the educational progress that Trevor has made at Diener and that it is an appropriate setting for him.

54.     MCPS School Psychologist, Seth Goldberg testified about the Carl Sandburg placement. He specifically noted that the school educates some of the most complicated and complex special education students in the county, including another student with ESES. He further testified that less intensive programs within the county tend to be a large step down from the intensity level that Carl Sandburg can provide.

55.     Despite Mr. Goldberg's characterization that no other program within MCPS comes close to providing a comparable level of support to Carl Sandburg, nobody from the

-15-

school system could explain why it took several years for the IEP team to recognize that Trevor required this level of service, and that the school based learning center at Rachel Carson could not meet his needs, especially when the parents had been advocating for a more intensive placement all along.

56.     On March 10, 2009, Administrative Law Judge Mary Shock issued her decision in *Trevor Scott v. Montgomery County Public Schools*, OAH No: MSDE-MONT-OT-09-41152. The ALJ held that the parents failed to prove that MCPS did not offer Trevor a FAPE for the 2007-08 and 2008-09 school years, and denied their request for reimbursement.  Specifically, she found that despite the school system's failure to obtain a medical evaluation of Trevor to assess his educational needs under the IDEA, the family was not denied a FAPE because the parents abandoned the IEP process.  Moreover, she found that MCPS had no obligation to further investigate and understand Trevor's ESES condition until the parents returned to the process.

57.     The parents presented significant evidence and testimony that at all times they were engaged in the IEP process and did not abandoned it.  Further, at no point has MCPS ever suggested that the parents abandoned the IEP process.

58.     The ALJ's decision contains palpable errors of fact and law.

59.     The plaintiffs are aggrieved by the decision of the ALJ.

60.     The plaintiffs have exhausted their administrative remedies.

### COUNT I

61.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 60.

62.    Defendants' failure to provide Trevor Scott with a free appropriate public education violates plaintiffs' rights under the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT II

63.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 60.

64.    Defendants' failure to consider all medical information submitted by the parent and fully evaluate Trevor Scott's special education needs violates plaintiffs' rights under the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT III

65.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 60.

66.    The failure of the ALJ to order defendants to place and fund Trevor in an appropriate program violates the IDEA and Maryland Law.

## COUNT IV

67.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 60.

68.    The ALJ committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to render a proper decision based on an accurate and impartial understanding of the facts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

-17-

1.    Issue judgment for plaintiffs and against defendants;

2.    Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.    Issue injunctive relief, vacating the decision of the ALJ and ordering defendants to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling Trevor Scott at the Diener School for the 2007-08 and 2008-09 school years;

4.    Order defendants to place and fund Trevor at the Diener School for the 2009-10 school year and declare it to be Trevor's current educational placement under the IDEA;

5.    Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.    Award any other relief that this Court deems just.


Respectfully Submitted,

Michael J. Eig            #07718
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs

-18-