IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

T.S., et al.                          :

                                      :

    v.                                :        Civil Action No. DKC 09-1581

                                      :

JERRY D. WEAST, et al.                :

                                      :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action arising under the Individuals with Disabilities Education Act are: (1) a motion for summary judgment filed by T.S. by and through his parents (Paper 10); and (2) a cross-motion for summary judgment filed by Defendants Montgomery County Board of Education and Jerry D. Weast (Paper 13). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiffs' motion will be denied, and Defendants' cross-motion will be granted.

## I.  The Individual with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and accompanying regulations, 34 C.F.R. § 300 et seq., require all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability,

with a free, appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found at Md. Regs. Code tit. 13A, § 05.01.

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process. *See Board of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982)(hereinafter "Rowley"). The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child. *Id.* at 207. The benefit must also be provided in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550. The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley*, 458 U.S. at 192, or that the education maximize each child's potential, *see Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). The benefit conferred, however, must amount to more than trivial progress. *See Reusch v. Fountain*, 872 F.Supp. 1421, 1425 (D.Md. 1994) (*Rowley's* "some educational benefit prong will not be met by the provision of de minimis, trivial learning

opportunities.") (citing *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled. 20 U.S.C. § 1414 (d). That IEP is formulated by a team ("IEP team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of the child, and, when appropriate, the child himself. 20 U.S.C. § 1414 (d)(1)(B); Md. Regs. Code tit. 13A, § 05.01.07 (A). The IEP must state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," i.e., spend time in regular school environments with non-disabled students. 20 U.S.C. § 1414 (d) (1) (A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *MM ex rel. DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir. 2002) (internal quotation marks and citation

omitted); *see also* 20 U.S.C. § 1415. Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student. Md. Regs. Code tit. 13A, § 05.01.13(B). A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP. Md. Regs. Code tit. 13A, § 05.01.08(B)(3).

If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f). In Maryland, the Maryland Office of Administrative Hearings conducts the due process hearing. Md. Code Ann., Educ. § 8-413; Md. Regs. Code Tit. 13A, § 05.01.15(C)(1). Any party can then appeal the administrative ruling to federal or state court. Md. Code Ann., Educ. § 8-413(h).

When a FAPE is not provided to a disabled student, the student's parent may place the child in a private school and then seek tuition reimbursement from the state. *See Sch. Comm. of Burlington v. Department of Education*, 471 U.S. 359, 369-70 (1985). To establish entitlement to reimbursement for

unilateral private placement, certain conditions must be met.
Title 20, § 1412(a)(1)(C)(ii), states:

> If the parents of a child with a disability,
> who previously received special education
> and related services under the authority of
> a public agency, enroll the child in a
> private elementary school or secondary
> school without the consent of or referral by
> the public agency, a court or a hearing
> officer may require the agency to reimburse
> the parents for the cost of that enrollment
> if the court or hearing officer finds that
> the agency had not made a free appropriate
> public education available to the child in a
> timely manner prior to that enrollment.

Reimbursement may be reduced or denied if:

> (aa) at the most recent IEP meeting that the
> parents attended prior to removal of the
> child from the public school, the parents
> did not inform the IEP Team that they were
> rejecting the placement proposed by the
> public agency to provide a free appropriate
> public education to their child, including
> stating their concerns and their intent to
> enroll their child in a private school at
> public expense; or

> (bb) 10 business days (including any
> holidays that occur on a business day) prior
> to the removal of the child from the public
> school, the parents did not give written
> notice to the public agency of the
> information described in item (aa);

Or,

> (III) upon a judicial finding of
> unreasonableness with respect to actions
> taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii)(I),(II). Finally, in order to

receive reimbursement, the private education services obtained

by the parents must be appropriate to meet the child's needs. *Sch. Comm. Of Burlington*, 471 U.S. at 370.

## II.  Background

### A.  Factual Background

T.S. is a nine-year old boy who lives in Maryland with his mother, father and younger sister.[1]  T.S. began showing developmental delays in speech, language and gross and fine motor skills when he was a toddler, and at eighteen months began receiving services through Montgomery County Infant and Toddler's Program.  By the time of the due process hearing, T.S. had been diagnosed with several disorders, including attention deficit hyperactivity disorder, speech-language impairment, developmental coordination disorder with dyspraxia, and also electrical status epilepticus of sleep ("ESES") a disorder in which seizures occur primarily during sleep.  ESES can be transient.

For the 2004-2005 school year, T.S. entered the preschool education program ("PEP") for three year old children at Stone

---

[1] Unless otherwise noted, all facts are from the Findings of Fact made by Administrative Law Judge ("ALJ") Mary Shock, found at Paper 3.  Plaintiffs offer their own detailed version of the facts that differs slightly from those published by the ALJ, and Defendants dispute some of the facts articulated by Plaintiffs. There is no evidence that the findings by the ALJ were not regularly made, thus the findings are *prima facie* correct. *Doyle v. Arlington County School Board*, 953 F.2d 100, 103 (4th Cir. 1991).

Mill Elementary School, a public general education school. He also spent his 2005-2006 year at PEP at Stone Mill. He was coded for both years as "Developmentally Delayed."

An IEP team met on March 27, 2006 to review T.S.'s program. T.S. would be five years old for the 2006-2007 school year and therefore eligible for kindergarten. The IEP team recommended that he be placed at the school-based learning center at Rachel Carson Elementary School in the special education kindergarten class. T.S.'s parents ("the Parents") signed the IEP recommendation.[2] (TS #5 at 13). At Rachel Carson, T.S. would receive speech and language therapy, occupational therapy and physical therapy. He would also participate with nondisabled peers in general school activities including lunch and recess. The code of "Developmentally Delayed" was continued.

Several months later, on June 13, 2006, the Parents asked MCPS to approve an independent educational evaluation. The Parents had not requested any testing prior to that date. At a July 11, 2006 IEP team meeting, the team decided to conduct speech, language, occupational therapy, psychological and educational assessments. On July 28 and 31, Elizabeth Rathbone,

---

[2] On May 15, 2006, the Parents applied to the Katherine Thomas School for the 2006-2007 school year. Paper 13, FN 3; MCPS #5-A. On June 2, 2006, they were informed of T.S.'s acceptance, and on June 13, 2006, they sent their non-refundable deposit to Katherine Thomas, reserving his place. MCPS #5-B and #5-C.

Ph.D., conducted a psychological assessment. Susan Carmi, Special Educator; Stacey Silverblatt, Speech/Language Pathologist; and Ursula Tello, Occupational Therapist, each wrote a developmental profile of T.S. as well.

On August 31, 2006, the IEP team met to review the assessments. On September 19, 2006, the IEP team reconvened. The team agreed on goals and again recommended that T.S. be placed at Rachel Carson for the 2006-2007 school year. T.S. was again coded as "developmentally delayed."[3] The parents placed their son at the Katherine Thomas School for the 2006-2007 school. Katherine Thomas is a private special-education school.

In September, October and December 2006, T.S. participated in a screening study for autism at the National Institutes of Mental Health ("NIMH"). T.S. met the criteria for developmental delay, but not for autism. In February 2007, T.S. underwent several other tests: an electroencephalogram which was abnormal due to slow background and bilateral multifocal epileptic, and a sleep study, which was also abnormal. Dr. Sadat Shamim diagnosed T.S. as suffering from ESES. On March 8, 2007, William Gaillard at the Children's National Medical Center saw

_____

[3] On page 114 of TS #21, a note says that the Parents requested "full-time special education + placement at Katherine Thomas + TLC." On the other hand it reads that, "IEP team feels that T.S. can benefit from participation with non-disabled peers."

T.S. for a neurologic consultation. At that point, T.S. was five years old and eleven months and had had no clinical history of seizures. Dr. Gaillard reviewed all the studies. Dr. Gaillard also recommended beginning treatment with steroids and zantac. (Paper 3, Ex. TS #31 at 2).

On March 13, 2007, the Parents sent the studies to MCPS, although two days later they asked MCPS to withhold the reports from personnel until they provided consent. According to Defendants, the Parents did not provide Dr. Gaillard's report to the IEP team until the May 2007 meeting. (Paper 13, FN 17).

On April 10, 2007, Dr. Eileen Vinning from Johns Hopkins saw T.S. for a second opinion regarding the sleep study findings and the other tests. She confirmed Dr. Gaillard's recommendation. (Paper 3, TS #31). She also confirmed his medication recommendations, and suggested other options as well. Both Dr. Gaillard and Dr. Vinning noted that there was no clinical history of seizures. (Paper 3, TS #31).

On May 2, 2007, William Tyson, School Psychologist, reviewed the NIH autism screening report. He found that T.S. met the criteria for the special education disability of mental retardation. He did not discuss the ESES in this assessment.

On May 7, 2007, the IEP team met for the annual review of T.S.'s IEP and to determine his special education disability code. The Parents then gave MCPS a copy of Dr. Gaillard's

report of T.S.'s neurological condition. The meeting ended when the parties present disagreed on the code.

On May 30, 2007, Mr. Tyson revised his review of the NIMH study, and again noted that T.S. "appears to meet the criteria for the special education disability of Mental Retardation (01) . . .". (TS #42, at 4).

A follow-up IEP meeting occurred on June 11, 2007. The Parents did not attend because MCPS did not give them a copy of Mr. Tyson's psychological review before the meeting.

At that point a series of scheduling issues arose. In July 2007, the Parents scheduled T.S. to visit Vincent Culotta, Ph.D. for a neuropsychological evaluation. A follow-up IEP team meeting was scheduled to occur on July 25; however, the Parents postponed it pending Dr. Culotta's evaluation. Then the Parents postponed Dr. Culotta's evaluation because T.S. had begun taking ESES medication, and his Parents wanted his medication regime to stabilize before he underwent further testing.

Without the Parents' consent, the IEP team met on August 14, 2007. The Parents did not attend. The IEP team developed goals and objectives for T.S.'s 2007-2008 year and proposed that he attend Rachel Carson and be placed in a special education classroom for eighty percent of the school week, and the remaining twenty percent in general education environment

(primarily for lunch and recess).  The team did not code him at that time.

On August 21, 2007, the Parents notified MCPS that they found the IEP inappropriate for T.S., that they were placing him in a non-public school, and that they were requesting that MCPS fund the placement.

T.S. attended the Diener School during the 2007-2008 school year, which was the first year that the school was opened.  The school developed and implemented a "learning profile and behavior plan" and T.S. made slow, steady progress in his goals.

Dr. Culotta finished his neuropsychological evaluation of T.S. in October 2007, and the Parents sent the report to MCPS on February 15, 2008.  Mr. Tyson reviewed the report on March 14, 2008, and MCPS scheduled an IEP team meeting for March 17, 2008 which was subsequently postponed until May 5, 2008.

Mr. Tyson and two other MCPS officials (a special education resources teacher and a speech-language pathologist) went to Diener to observe T.S. on March 31, 2008.

On May 5, 2008, the IEP team met to review and discuss the observations, Dr. Culotta's report, the PEP evaluations and all the medical studies.

The parties held an IEP team meeting on June 2, 2008.  The team agreed that T.S. would be coded "Other Health Impaired" ("OHI"), and the team agreed on T.S.'s goals and objectives for

the 2008-2009 school year. The case was then referred to MCPS'
central IEP ("CIEP") team to discuss and decide placement.

T.S. requires special education and related services
including: a small, self contained classroom with a low
student-to-teacher ratio; planned, supervised, kinesthetic
activities throughout the day; minimized distractions;
opportunities for over-learning and review; psychological
consultation; a behavioral intervention plan; and accommodations
including extra processing and response time, cuing to remain on
task, and sensory breaks.

On July 7, 2008, the CIEP team held a meeting to discuss
T.S.'s placement. The team recommended that he be placed in the
Carl Sandburg Learning Center ("CSLC"), a separate public
special education day school. The Parents and their counsel
attended the meeting. (MCPS #37).[4]

In a letter to an attorney for the Parents dated July 11,
2008, MCPS noted that after discussions with the staff at CSLC,
their response was "consistent with the IEP team's

---

[4] During the meeting, George Moore, the IEP chair, noted
that the Diener School is not approved for special education.
(MCPS #37; Addendum, at 1). The Parents also expressed their
support for the Diener School, noting that it was "the best
thing that has happened to" T.S. (*Id*. at 2). Finally, a note
on the bottom of Addendum page 4 says that "parents will
continue placement (private) at Diener . . ." and is then cut
off. (*Id*. at 4).

recommendation that [T.S.'s] needs can be met at Carl Sandburg Center without a one to one aide." (Paper 3, TS #86).

The Parents decided to keep T.S. at Diener and decided to seek reimbursement for the placement. They then sought review of the decisions made by MCPS through the appropriate channels. *See* 20 U.S.C. § 1415.

**B.   Procedural Background**

On November 7, 2008, the Parents, on behalf of T.S., filed a due process complaint with the Office of Administrative Hearings ("OAH") requesting reimbursement for the tuition to the private schools at which they had placed him.   (TS #1).   On November 18, 2008, the parties waived the resolution meeting and did not engage in mediation, and on November 25, the case was transmitted to OAH.   The due process hearing was held from February 9-13, 2009 before Administrative Law Judge Mary Shock ("the ALJ").   The parents requested reimbursement for the 2007-2008 and 2008-2009 school years at Diener.

The ALJ framed the issues presented to her as follows:

1)   Was the August 14, 2007 IEP proposed by MCPS reasonably calculated to provide T.S. with a free appropriate public education for the 2007-2008 school year?

2)   Was the July 7, 2008 IEP proposed by MCPS reasonably calculated to provide T.S. with a free appropriate public

education for the 2008-2009 school year?

3)   If not, is the Diener School an appropriate educational placement for T.S., and if so, are the Parents entitled to reimbursement of tuition and expense for their unilateral placement of T.S. at the Diener School for the 2007-2008 school year and/or the 2008-2009 school year?

(*See* ALJ Decision, at 3-4).   On March 10, 2009, the ALJ issued her decision in *[T.S.] v. Montgomery County Public Schools*, OAH No: MSDE-MONT-OT-09-41152.   She held that the parents failed to prove that MCPS did not offer T.S. a FAPE for the 2007-08 and 2008-09 school years, and denied their request for reimbursement.  (ALJ Decision, at 36).

T.S., by his parents, filed an appeal to this court on June 16, 2009 naming Jerry Weast, Superintendent of MCPS, and the Montgomery County School Board as co-Defendants.   (Paper 1). Plaintiffs filed a motion for summary judgment on October 26, 2009.  (Paper 10).  Defendants filed a cross-motion for summary judgment (acting as a response) on January 6, 2009.  (Paper 13). Both parties then filed replies.  (Papers 14 & 17).

Because Judge Schock's factual findings were regularly made, these findings, including her finding that each IEP was reasonably calculated to provide T.S. with an educational benefit, must be viewed as *prima facie* correct.  *MM ex rel. DM*,

303 F.3d at 531. It remains, however, for this court to reach its own *de novo* determination of the facts, giving "due weight" to Judge Shock's findings, and to explain any deviation from those findings. *Id.* at 530-31.

**III. Cross Motions for Summary Judgment**

    **A.    Standard**

In *MM ex rel. DM v. Sch. Dist. of Greenville County*, 303 F.3d 523 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit articulated the standard of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified *de novo* review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities. . . .

303 F.3d at 530-31 (citations omitted). This standard works in tandem with general standards of review for summary judgment, which also apply in IDEA cases, as illustrated in *Bd. of Educ. of Frederick County v. I.S. ex rel. Summer*, 325 F.Supp.2d 565 (D.Md. 2004):

> [T]he Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

15

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care [. . .] to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir. 1987).

325 F.Supp.2d at 578.

Plaintiffs face an uphill battle in this case because just as they were required to carry the burden of proof in the administrative hearing, so too must they carry the burden of proof here. See *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49

(2005); *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md. 1999).

"If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991)). Additionally, in giving due weight to the findings of the ALJ, this court "owes deference to the ALJ's determinations of the credibility of witnesses." *Wagner v. Board of Education of Montgomery County*, 340 F.Supp.2d 603, 611 (D.Md. 2004). "'The fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility.'" *Justin G. ex rel. Gene R. v. Board of Education*, 148 F.Supp.2d 576, 588 (D.Md. 2001)(quoting *Board of Education of Montgomery County v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 706 (D.Md. 2000)); *see also Doyle*, 953 F.2d at 104.

**B. Analysis**

The United States Court of Appeals for the Fourth Circuit has found that

> In *Burlington School Committee v. Mass. [] Department of Education*, 471 U.S. 359 (1985), the Supreme Court held that parents who believe that the education offered by the public schools is inappropriate may unilaterally place their child in a private school and are entitled to reimbursement from the state for tuition and expenses if it is subsequently determined that the

17

> public school system failed to comply with
> its statutory duties and that the private
> school provided an appropriate education.

*Carter v. Florence County School District Four*, 950 F.2d 156, 158 (4th Cir. 1991). Based on the Supreme Court's decision in *Burlington*, the Fourth Circuit has articulated a two-part analysis to determine when parents should be reimbursed for private school placement. *A.B. v. Lawson*, 354 F.3d 315, 320 (4th Cir. 2004)(citing 41 U.S. at 369-370). First, the court must determine that the IEP designed for the child was inappropriate. Second, the court then examines whether the unilateral private placement resulted in an appropriate education for the child's needs. *Id.* In this case, the analysis begins and ends with the first prong, because the IEPs designed for T.S. were not inappropriate.

## 1. Procedural Violations

Plaintiffs insist that the ALJ erred by finding that MCPS provided a FAPE to T.S. They contend that MCPS did not comply with the mandatory procedures in development and preparation of the IEP, and therefore T.S. was not provided a FAPE.

Before addressing their specific contention – which Defendants argue is not even properly before the court – it is worth noting that, as far as IDEA is concerned, process matters only insofar as it interferes with provision of a FAPE. Beginning in 1997, the Fourth Circuit has made clear that,

ordinarily, procedural violations of IDEA are subject to a
harmlessness analysis. The Fourth Circuit has explained that
it

> took the opportunity in *Gadsby [ex rel.*
> *Gadsby v. Grasmick]* to clarify [its] holding
> in *Hall* as follows: "However, to the extent
> that the procedural violations did not
> actually interfere with the provision of a
> free appropriate public education, these
> violations are not sufficient to support a
> finding that an agency failed to provide a
> free appropriate public education."

*DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester County, Md.*,
309 F.3d 184, 190 (4th Cir. 2002) (quoting *Gadsby ex rel. Gadsby*
*v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997)). The Fourth
Circuit reiterated that "under our circuit precedent, a
violation of a procedural requirement of the IDEA (or one of its
implementing regulations) must actually interfere with the
provision of a FAPE before the child and/or h[er] parents would
be entitled to reimbursement relief[,]" even when the procedural
violation "interfere[s] with the parents' ability to participate
in the development of their child's IEP." *DiBuo*, 309 F.3d at
190-91 (4th Cir. 2002); *see also A.K. ex rel. J.K.*, 484 F.3d at
679 n.7 (noting that procedural violations are subject to
"harmlessness" analysis, while substantive violations of the
IDEA are not).

### a. Plaintiffs' Failure to Evaluate Argument

Plaintiffs argue that the specific procedural failure in this case occurred when MCPS did not "properly evaluate" T.S.'s needs. (Paper 10, at 19-22). They argue that MCPS did not live up to the IDEA's standards in medically evaluating T.S., and that once T.S. was properly diagnosed with ESES in February 2007, MCPS did not evaluate how the ESES would affect his learning. (*Id.* at 22). Therefore, Plaintiffs argue, the Parents were forced to obtain their own private evaluation, which took several months to complete because of T.S.'s ongoing medical needs and lack of an established regimen for treating his condition. (*Id.* at 24).

Defendants argue that Plaintiffs did not raise this "failure to evaluate" argument in their Due Process Hearing Complaint and did not raise it during the ALJ hearing until their closing argument. (*See* Transcript at 1374, 1390). During the closing argument at the hearing, and again in their motion for summary judgment, Defendants object to Plaintiffs' arguments regarding a failure to evaluate. (*See* Transcript at 1398; Paper 13, at 27-29). Plaintiffs confront this argument with two contentions. First, they say that they did in fact raise the issue of MCPS' failure to evaluate because they asserted that MCPS denied T.S. a FAPE, which is an allegation that "can include a failure to evaluate." (Paper 10, at 25). Second, in

their reply, Plaintiffs alternate tactics and argue that the Due Process Hearing Complaint did raise the issue of "miscoding" and that "miscoding" and "failure to evaluate" are "one and the same." (Paper 14, at 9).

Despite Defendants' objections during the closing arguments of the ALJ hearing, the ALJ squarely covers the issue of evaluations in her Opinion. She writes that

> The threshold issue in this case is whether MCPS denied the Student a FAPE because it failed to properly evaluate the Student's disabilities, or because it failed to offer the Student appropriate goals and objects, and placement for the 2007-2008 and 2008-2009 School Years.

(ALJ Opinion, at 29). She goes on to discuss the law related to medical evaluations under the IDEA and its accompanying regulations. (*See* ALJ Opinion, at 30-31). She finds that "even if MCPS was obligated to obtain medical services for diagnosis or evaluation of the Student's education needs based on the diagnosis of ESES, failure to do so" by the summer of 2007 did not deny T.S. a FAPE because the Parents abandoned the IEP process after May 7, 2007. (*Id.*). The ALJ ultimately finds that T.S. was not denied a FAPE for either 2007-2008 or 2008-2009 and thus implicitly also holds that even if MCPS did not perform the medical evaluations that Plaintiffs argue it did not, the point is moot. The ALJ has already discussed the issue of T.S.'s evaluations (or lack thereof), and implicitly rejected

Defendants' argument that the issue was not before her. The reason for the rule that only issues raised in the administrative proceedings may be pressed before the court is not offended in these circumstances.

**b. The Initial Evaluation and 2006-2007 School Year[5]**

Plaintiffs' arguments, however, are ultimately unavailing because MCPS complied with the IDEA's mandates for process and created IEPs with appropriate goals and objectives for each school year.

The first IEP team meeting that is relevant to this case occurred on March 27, 2006, as noted above. After this meeting, the Parents sent a letter to MCPS asking MCPS to conduct an educational evaluation. (TS #8). That letter, which came from Plaintiffs' counsel, said that

> Montgomery County Public Schools has not completed any psychological or educational evaluations of [T.S.], despite numerous requests from his parents to do so. We are therefore requesting that MCPS approve a full Independent Educational Evaluation immediately.

(TS #8). Defendants dispute the idea that the Parents had made previous requests for an evaluation and contend that this letter was the first request for an evaluation. A letter included in

_____

[5] Although Plaintiffs are not seeking reimbursement for the 2006-2007 school year, because the IEP process builds upon itself each year, it is important to understand what happened when the IEP team first came together to create T.S.'s IEP.

evidence from MCPS dated June 14, 2006 states their position, and notes that now that the client is making a request for assessment, MCPS will convene an IEP meeting to discuss the evaluation process. (TS #9). At an IEP team meeting in July 2006, the team decided to conduct several assessments, all of which were completed within a month's time. On August 31, 2006, the IEP team met again to review the assessments. At a follow-up meeting T.S. was coded as having developmental delays and the team agreed that Rachel Carson would be appropriate for him.

Within this chain of events, there are no procedural defects. The Parents asked for an evaluation, MCPS promptly complied, and the evaluation was reviewed and the data used when the recommendation for Rachel Carson was made. Finally, the goals and objectives at Rachel Carson are substantively similar to the goals and objectives for T.S. at Katherine Thomas. (*See* ALJ Opinion, at 12-13).

At that point, the Parents decided to enroll T.S. in a series of medical tests at NIMH and other nearby medical facilities. The tests revealed, among other things, that T.S. was suffering from ESES. They received all the tests in March and sent some of the reports to MCPS at that point. They brought a review by Dr. Gaillard to the IEP team's May 2007 meeting.

## 2. The 2007-2008 School Year

Creating the IEP and recommending placement for the 2007-2008 school year proved more contentious than the previous year. Plaintiffs argue that Mr. Tyson, the IEP team member psychologist, did not adequately review the information provided by the Parents to MCPS prior to the May meeting and then, when he agreed to include it in his revised report about T.S., "he did nothing to learn more about it or how it affected [T.S.]." (Paper 10, at 32). Parents argue that "*nobody from MCPS, including Mr. Tyson ever reviewed the medical documentation*" that the Parents had submitted to the IEP team. (*Id.*). The Parents were also angry that Mr. Tyson suggested coding T.S. as mentally retarded for the 2007-2008 school year. No code was ultimately used that year because none was agreed upon.

After the May 7, 2007 IEP team meeting that ended when the parties disagreed on the code for T.S., Mr. Tyson revised his review of the NIMH study. On June 11, 2007 the IEP team reconvened. The Parents, however, refused to attend because MCPS did not give them a copy of Mr. Tyson's review before the meeting. Although it was their right to refrain from attending, as the ALJ noted, the law does not require that evaluations be provided in advance. The Parents then postponed the next IEP team meeting which was to occur on July 25, 2007 and did not attend the meeting scheduled on August 14, 2007.

Because the school year was about to begin and no IEP had been devised, the IEP team met on August 14, 2007 without the Parents. Federal regulations at 34 C.F.R. § 300-322 clarify parental participation in an IEP team. The regulations note that while the school district must give notice to parents with the purpose, time, and location of the meetings and who will be in attendance, a "meeting may be conducted without a parent in attendance if the public agency is unable to convince parents that they should attend." 34 C.F.R. § 300-322(d). Although several attempts were made to hold the IEP team meeting with the Parents, the team was finally forced to meet without them. The ALJ found that based on the facts above – and because the Parents did not get in touch with the IEP team again until February 2008 – the Parents had essentially abandoned the IEP process and placed T.S. at a private school.

Plaintiffs argue that the ALJ erred in finding that the parents abandoned the IEP process, and that MCPS did not provide a FAPE for the 2007-2008 year.

The ALJ found that

> MCPS first had notice of the Student's
> ESES diagnosis when the Parents sent the
> EEGI, z-ray, and sleep study reports on
> March 13, 2007. (TS #27, 28, 48). Although
> the Parents initially curtailed MCPS' review
> of those reports, MCPS staff had the reports
> at least by the May 7, 2007 IEP team
> meeting. At that meeting, the Parents also
> gave MCPS Dr. Gaillard's report of his

neurological condition. (TS #31). Rather
than discussing the reports and any
educational implications, however, the
parties argued about the MR coding. William
Tyson, MCPS School Psychologist, who had
been assigned to review and discuss the NIMH
autism report, (TS #39), explained that the
Student met the criteria for an MR code
based on the testing. The Parents
disagreed. Words were exchanged. The
meeting could not continue because of the
hostility between the parties. After the
May 7, 2007 meeting, the Parents failed to
return for any IEP team meetings for the
2007-2008 School Year. . . . While the law
requires each public agency to ensure
parental participation in the IEP process by
giving notice of meetings and other
information, parents are not required to
attend the meetings. 34 C.F.R. 300-322
(2008). I find that the Parents in this
case waived their right to participate in
the process, and, instead, placed the
Student at a private school.

(ALJ Opinion, at 31-32).

There are several reasons that Plaintiffs fail to show that

MCPS did not offer T.S. a FAPE. First, although the

characterization by the ALJ of "abandonment" of the process by

the Parents may be unduly harsh, it is clear that Parents had

the opportunity to participate in the meetings and chose not to,

as was their right. This fact, however, does not mean that any

procedural violation has occurred that would result in denying

T.S. a FAPE. Second, any procedural irregularity that may have

occurred with Mr. Tyson's review did not actually interfere with

the provision of a FAPE. The IEP team met and promulgated goals

and objectives for the school year, and found that Rachel Carson could provide an environment in which he could meet those goals. Plaintiffs do not present any evidence – other than preference by the Parents – that Rachel Carson was not appropriate for T.S. During the ALJ hearing, several witnesses – including an expert in special education – all testified that Rachel Carson would have provided an appropriate placement for T.S. Furthermore, Rachel Carson would have provided the least restrictive environment for T.S. because he would have been able to participate in recess and lunch with non-special education peers. Finally, it was objectively unreasonable for the Parents to refuse to attend any of the meetings scheduled to review their son's IEP before the 2007-2008 school year. While the Parents may have been continuing to gather information and evaluations about their son's disorder, the IEP team meetings could not simply be pushed back over and over again, because an IEP needed to be created for T.S. before the beginning of the school year. Whether the Parents' behavior is termed "abandonment" or "unreasonable," it is clear that they were not engaged with the IEP team during the summer or fall of 2007. Therefore, under 20 U.S.C. § 1412(a)(1)(C)(iii)(III), reimbursement for attendance at the Diener school may be denied.

Plaintiffs offer one final argument attacking the 2007-2008 IEP. They argue that because MCPS decided that CSLC – rather

than Rachel Carson - would be appropriate for T.S. for the 2008-2009 school year, MCPS erred in not placing him at CSLC the previous year. This argument has been consistently denied as having any merit. The Fourth Circuit, in *Shaffer ex rel. Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009), addressed a similar argument. In that case, the Parents argued that a student's tenth grade IEP – which was different from his previous IEPs – was an admission by the school system that he had a severe auditory processing problem and had needed small classes all along. They argued that this was proof that the eighth-grade IEP was inappropriate. The Fourth Circuit characterized Plaintiff's request to rule this way as promoting a "hindsight-based review that would have conflicted with the structure and purpose of the IDEA." *Id*. at 475. The court noted that

> Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *Burlington*, 736 F.2d at 788; *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). But this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created. *Cf. Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 161 (3rd Cir. 1994) (affirming the district court's conclusion that evidence of a later IEP was

> "irrelevant to the issue of the appropriateness of" prior IEPs).

*Id*. at 477. Furthermore,

> if services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information. This scenario is the exact opposite of what Congress intended when it provided for regular review and revision of IEPs, see 20 U.S.C. § 1414(d)(4)(A), and it would do little to help the interests of disabled children.

*Id*. In this case, a new evaluation was brought to the attention of the IEP team after the 2007-2008 IEP had been created. The Parents forwarded a report completed by Dr. Culotta in October 2007 to the IEP team in February 2008. Furthermore, the Parents were once again engaged in the IEP team meetings in 2008 and brought with them their understanding of what was happening with their son. The 2008-2009 IEP cannot be used to discredit the earlier IEP that the team had formulated by August 2007.

### 3.  The 2008-2009 School Year

The ALJ found that the Parents "failed to prove that the Student's 2008-2009 IEP was inappropriate or could not be implemented at Carl Sandburg." (ALJ Opinion, at 36). After reviewing the procedures used by the IEP team, and the goals and objectives set, there is no evidence that T.S. did not receive a FAPE for the 2008-2009 year and no evidence that the goals and objectives set could not have been implemented at CSLC.

The IEP team met on June 2, 2008 and agreed on goals and objectives for T.S. for the following school year. After not coding him at all the previous year, the team decided that a code of "Other Health Impaired" was appropriate. A CIEP team met on July 7, 2008 to discuss T.S.'s placement and recommended that he be placed at CSLC, which the team decided and the ALJ held could implement his 2008-2009 IEP. (ALJ Opinion, at 24). Ultimately, the Parents decided unilaterally to keep T.S. at the Diener School.

Plaintiffs' argument for reimbursement based on failure to provide a FAPE in 2008-2009 is premised on accepting that there was no FAPE for the 2007-2008 school year. In their arguments Plaintiffs insinuate that if MCPS would have done the "right thing" by placing T.S. at a school like CSLC in 2007, then the Parents may have acquiesced and sent T.S. there. However, because MCPS did not, the Parents were forced to go out and find Diener and send T.S. there – and they did not want to move him after one year.

Plaintiffs contend that the ALJ was wrong to find that the school district had provided a FAPE through its recommendation of CSLC. Ultimately, their arguments fail and the ALJ's findings must be sustained. Although moving a child after a single school year can be difficult, the desire not to disrupt T.S. does not mean that MCPS failed to offer T.S. a FAPE (as the

ALJ noted).   After admitting that the parents were "impressed with much of what they saw at Carl Sandburg, and would have considered it, had the timing been different . . ." Plaintiffs half-heartedly attempt to explain that they did not have faith in the Principal at CSLC and that therefore they did not believe it was a good fit.  (Paper 10, at 35).  Many witnesses testified at the ALJ hearing that CSLC could implement the goals and objectives that the IEP team had decided upon for the 2008-2009 year.  (*See* ALJ Opinion, at 20-24).   Indeed, another student with ESES was attending CSLC at that time and so the staff had learned about the disorder.   It is clear that T.S.'s IEP could have been successfully implemented at CSLC.

Plaintiffs have failed to prove that the 2007-2008 IEP was inappropriate or could not be implemented at Rachel Carson. They similarly failed to prove that the 2008-2009 IEP was inappropriate or could not be implemented at CSLC.   T.S. was provided a FAPE for both school years.   Therefore, no need exists to move on to the second prong of the *Burlington* test on reimbursement for private school placement by parents.

## IV. Conclusion

For the foregoing reasons, the motion filed by Plaintiffs will be denied and the motion filed by Defendants will be granted. A separate Order will follow.

                                                      /s/
_____
DEBORAH K. CHASANOW
United States District Judge